UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYMBERLY ALEEM DUNCAN,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al.,<br><br>    Defendants. | Case No. 24-cv-08528-JCS<br><br>**ORDER GRANTING MOTION TO REMAND**<br><br>Re: Dkt. No. 13 |

## I. INTRODUCTION

Plaintiff Kymberly Aleem Duncan brought this employment discrimination case in the Superior Court of the State of California, County of Alameda, asserting state law claims against State Farm Mutual Automobile Insurance Company and Jeanette Nicole Little. Defendants removed the case to federal court pursuant to 28 U.S.C. §§1441(a) and (b) and 1446 based on diversity jurisdiction under 28 U.S.C. § 1332. Although it is undisputed that Duncan and Little are citizens of California, Defendants asserted in the Notice of Removal that there is complete diversity of citizenship because Little was fraudulently joined in this action. Plaintiff now brings a Motion to Remand ("Motion") asserting that the case should be remanded to state court because Little was not fraudulently joined and therefore, there is no diversity jurisdiction. The Court finds that the Motion is suitable for determination without oral argument and therefore vacates the motion hearing set for February 26, 2025 pursuant to Civil Local Rule 7-1(b). The Case Management Conference set for the same date is also vacated. For the reasons stated below, the Motion is GRANTED.[1]

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Allegations in the Complaint

Plaintiff is an individual residing in the City of Hayward, Alameda County, California. Compl. ¶ 1. Defendant State Farm Mutual Automobile Insurance Company is a corporation with its principal place of business in Bloomington, Illinois. *Id. ¶* 2. Defendant Jeanette Nicole Little is an individual residing in the City of Pleasanton, Alameda County, California. *Id.* ¶ 3.

According to Plaintiff, she "worked in State Farm's Pleasanton, California office and had been working in the Claims Department until on or about June 16, 2016[,] when State Farm offered [her] a position as a Litigation Attorney in the Claims Litigation Counsel ('CLC') Department." *Id.* ¶ 8. She was "the only African-American woman out of twenty-one attorneys in the Pleasanton office." *Id.*

Plaintiff alleges that she had previously sought such a transfer and had met with the former managing attorney of CLC, Philip Anderson, to discuss a lateral transfer to CLC in 2011. *Id.* ¶ 10. Plaintiff was not offered a transfer at that time and was told that such a transfer would entail a pay cut, but a white male State Farm employee was offered a transfer to CLC in 2011 and was not required to take a pay cut. *Id.* Plaintiff alleges that she was not offered a transfer in 2011 because Defendant Little, who was second in command at CLC and had worked with Anderson for twenty years at State Farm, convinced Andersen not to offer Plaintiff the lateral position. *Id.* When Anderson offered Plaintiff the litigation associate position in 2016, he told her he had "grown so much" and was "more open now[,]" which Plaintiff took "to mean that [Anderson] was now open to hiring people of color." *Id.* ¶ 11.

According to Plaintiff, Anderson was her managing partner at CLC from June 16, 2016 to approximately June 18, 2021. *Id. ¶* 13. Although she "was a top performer and consistently received positive performance reviews" during this period, Anderson allegedly "personally conveyed his unhappiness with Plaintiff's success as a litigation attorney under his supervision." *Id.* ¶ 14. As an example, Plaintiff alleges Anderson "periodically told [her] that the paralegals were 'afraid' of her and criticized Plaintiff for walking around like she was still a manager." *Id.* Plaintiff alleges that "Andersen made these comments in order to attribute to Plaintiff a well-

2

known racist stereotype, often described as the 'Angry Black Woman[ ]'" – a stereotype that "promotes a false narrative about African-American women, who are performing their work in a manner professionally and appropriate to the workplace and are falsely tagged by supervisors as loud, angry and aggressive in performance reviews as a pretext for denial of promotions, discipline and/or termination." *Id.* According to Plaintiff, she later spoke to her work colleagues "and they confirmed to Plaintiff that she was not doing anything that might be construed as intimidating or likely to cause co-workers to be afraid of her." *Id*.

Plaintiff alleges that on one occasion, Andersen "made a side agreement with a white, male attorney, who represents plaintiffs who sue State Farm insureds, that Plaintiff would be removed from a pending case and that this attorney, as counsel adverse to State Farm, would not have to work with Plaintiff." *Id.* She alleges that there was no cause for the agreement, which was never explained, and that it "was so irregular and against State Farm's policies that Executive Manager, Kevin McGuire (Anderson's supervisor) determined that there was cause to intervene and require Anderson to apologize to Plaintiff." *Id.*

Around June 2021, Anderson retired and Little took over his position, making her Plaintiff's managing attorney. *Id.* ¶ 15. Plaintiff alleges that in the two years that followed, "Little, who has remained a close friend of Anderson since his retirement, oversaw a series of escalating racially discriminatory actions toward Plaintiff, as herein alleged, including working behind the scenes to derail job promotions for which Plaintiff was both eligible and qualified, and creating a fraudulent record of performance issues that included the same racist stereotypes alluded to by Anderson and now presented with even greater racial animus by Little." *Id.* According to Plaintiff, the racially motivated hostile work environment created an "intolerable situation" that resulted in her constructive discharge in May 2023. *Id.*

Plaintiff alleges the following specific facts in support of her claim that Little created a hostile work environment:

> 16. Little's and State Farm's unlawful conduct was ongoing and escalating throughout 2021 and 2022. Plaintiff is informed and believes that Andersen was instructed by upper management to train Plaintiff to be a managing attorney, which he never started. After Andersen's retirement, Little continued to ignore this directive (i.e., Plaintiff's training for the managing attorney position).

3

17. Further, as Plaintiff's managing attorney, Little assigned Luke Fornwald ("Fornwald"), to be Plaintiff's new paralegal. Plaintiff is informed and believes that Little reassigned Fornwald at the request of another attorney, who Little favored. Plaintiff is informed and believes that Little knew of Fornwald's performance issues at the time of the reassignment. On or about November 23, 2021, Plaintiff notified Little that Fornwald was experiencing performance issues and requested that Little assign a different paralegal to Plaintiff. Plaintiff is informed and believes that Little knew that Fornwald had performance issues and the potential impacts on Plaintiff's workload. Nevertheless, Little rejected Plaintiff's request to reassign Fornwald.

18. Further, in or around 2021, Plaintiff requested that Little assign Plaintiff as a "Law and Motion" specialist. Little did not respond to Plaintiff's request. In or around 2022, Plaintiff followed up on her request to be assigned as a Law and Motion specialist. Little again did not respond. Little subsequently appointed another attorney in the department to the Law and Motion specialist position.

19. As of June 2021, Plaintiff was informed and believed that she was considered a rising star at State Farm, destined for management training and leadership positions. Little used her influence and access in the organization to derail Plaintiff's other efforts to seek promotions within State Farm. On or about January 21, 2022, Plaintiff applied for a paralegal supervising attorney position with State Farm. Plaintiff informed Little of her application. In response, Little offered to assist Plaintiff's job interview preparation and purportedly attempted to schedule a mock interview for Plaintiff with the TRG Committee. However, the TRG Committee was unable to assist with mock interviews for this position. Little also took no further action to assist Plaintiff in her preparation. Plaintiff ultimately did not receive any aid in the interview preparation process. On or about February 3, 2022, Plaintiff received an email informing her that she had not been selected for an interview. On February 4, 2022, Plaintiff received an official rejection notice from State Farm.

20. On or about April 18, 2022, State Farm posted two job openings in the Auto Claim Counseling Unit. Plaintiff applied for an in-house counsel position on or about May 2, 2022 and was selected for an interview on or about May 5, 2022. Plaintiff informed Little of her impending interview and asked Little to provide practice questions, to which Little complied. Plaintiff was interviewed on or about May 19, 2022, but State Farm rejected her application on or about May 30, 2022. Plaintiff was later warned by a senior vice president of State Farm about what Little was "saying to hiring executives behind closed doors."

21. In or about 2022, Little commenced an overt campaign to create a fraudulent performance record so as to cast doubt on Plaintiff's competency to do her job and work with others. On or about May 31, 2022, Little reached out to Plaintiff to discuss changes to their teams. On or about June 2, 2022, Little notified Plaintiff that a colleague was on bereavement leave and requested that Plaintiff take over half of the colleague's caseload, greatly increasing work demands on Plaintiff. Plaintiff agreed.

4

22. On or about June 20, 2022, Plaintiff received the results of a file review on one of her litigation matters. Little reviewed the file and gave Plaintiff a score of 75.862 percent on the grounds that Plaintiff purportedly failed to take depositions of key witnesses to the incident at issue. Plaintiff subsequently informed Little that there was no need to take depositions in that case because State Farm had made a prior decision as to liability in the case. Plaintiff also informed Little that she had a responsibility to both State Farm and the policyholder to ensure that they did not incur unnecessary costs.

23. On or about June 27, 2022, Plaintiff applied for two positions at the Bloomington, Illinois State Farm office: Claims Consultant and Claims Manager. Since many of the high-level jobs within State Farm were based out of the Bloomington office, State Farm employees often applied to jobs based in Bloomington. After applying for the jobs, Plaintiff asked Little for advice and requested a meeting with Little in advance of the interviews. Little informed Plaintiff that she would be unavailable during the requested time and stated that she would contact the TRG Committee to conduct a mock interview with Plaintiff. On or about July 8, 2022, Plaintiff contacted David Caparelli ("Caparelli") to schedule a 15-20 minute meeting to discuss his day-today responsibilities as a claims consultant. On or about July 15, 2022, Little emailed Plaintiff stating that she was aware Plaintiff had reached out to Caparelli, that Caparelli was "extremely busy" and unable to meet, and instructed Plaintiff to contact another person. Months after Plaintiff submitted her applications, on or about September 9, 2022, State Farm notified Plaintiff that she was not selected for an interview for either the Claims Manager or the Claims Consultant positions. Plaintiff is informed and believes that Little did not want Plaintiff to become a Claims Consultant because the Claims Consultant position controls the CLC, including Little's caseload. Plaintiff is informed and believes that Little prevented Plaintiff from becoming a Claims Consultant for that reason.

24. On or about July 19, 2022, Plaintiff received her performance review for the second quarter of 2022. In the performance review, Little claimed that Plaintiff was not meeting two of Plaintiff's goals, both of which allegedly related to communication. The first goal was to support a high-performing, diverse, inclusive, and innovative environment in addition to supporting efforts to attract, retain, and develop high-performing personnel. The second goal was to support and foster an inclusive environment through respect and support of the diverse talents, strengths and perspectives of associates and leaders, and supporting the advancement of diversity in the legal profession. Little stated that Plaintiff needed to improve her "personal effectiveness," as Plaintiff's interactions with others could be "abrupt and confrontational." In response to the comments in her performance review, Plaintiff requested that Little's supervisor, Kristin Givens ("Givens"), and a representative from Human Resources attend Plaintiff's next one-on-one meeting with Little. Plaintiff requested that Givens and a Human Resource representative attend the meeting because she believed that Little's comments were racist and derogatory.

25. On or about July 25, 2022, Plaintiff, Little, and Givens held a meeting to discuss Plaintiff's performance review. No Human

5

Resources representative attended the meeting. Carl van Dongen (Vice President and Counsel for State Farm) and Rich Garcia were aware of the situation. During the meeting, Little and Givens were unable provide examples in support of their conclusion that Plaintiff did not meet her communication goals.

26. On or about November 1, 2022, Plaintiff, Little, Givens, and Tori Digges (Human Resources and Development performance support for State Farm) attended a second meeting regarding Plaintiff's performance review. Little provided two examples regarding Plaintiff's communication skills, both of which allegedly occurred a year earlier – in the fourth quarter of 2021. First, Little alleged that Plaintiff entered Little's office and allegedly yelled at Little about Plaintiff's assigned paralegal. Second, Little alleged that Plaintiff yelled at Ashley Stater, the office manager. Givens also provided an example in which she had a phone call with Plaintiff about a job opening and Plaintiff allegedly "became emotional and raised [her] voice." Little and Givens indicated that the language regarding Plaintiff's communication skills would remain in Plaintiff's third quarter 2022 performance review. In response, Plaintiff denied these allegations, and confirmed her continuing concern that Little was retaliating against her for having voiced her objections to Little's past discriminatory conduct toward Plaintiff. Shortly after this second meeting, Plaintiff's executive mentor (who was working with Plaintiff on development in executive management skills and corporate relationship building) cancelled all future calendared mentorship meetings. Plaintiff became extremely distressed and humiliated by these events, suffering anxiety, depression, hives and insomnia in the weeks and months that followed.

27. Little persisted further in her efforts to create a pretextual bad performance record. Little complained in Plaintiff's performance review that Plaintiff issued case reports that were too long and that Plaintiff had attendance issues. Plaintiff disagreed with Little's characterization of the case reports and told Little that the reports complied with State Farm's standards. With regard to attendance, Plaintiff was aware that State Farm permitted employees to take paid time off ("PTO") without prior approval from a supervisor. Plaintiff was informed that, as long as she had accrued a sufficient number of hours and her calendar was clear, she could take PTO at any time. In or around July 2022, Plaintiff attempted to schedule a meeting with Little, Givens, and Human Resources to discuss the aforementioned communication issues. In response, Little attempted to set up a meeting for the same day. Plaintiff informed Little that she was ill and was taking off the rest of that day and the next day. Plaintiff is informed and believes that she was permitted to take time off based on her many years of experience with State Farm's PTO policy. Notwithstanding this, Little thereafter added Plaintiff's attendance record to the list of pretextual claims in Plaintiff's performance review.

28. In or around December 2022, Little and Givens met with Plaintiff and agreed that Plaintiff no longer had any communication issues. Nevertheless, Little copied and pasted her prior criticism of Plaintiff's communication skills into Plaintiff's performance reviews for the third and fourth quarters of 2022. At this point, Plaintiff realized that

6

> this was never going to stop and that by placing these notations in the file, Little was setting up the pretext to impose still further unwarranted hostility, harassment, denial of promotions within the company, and worse, potentially terminate Plaintiff, ending her 30 year career with State Farm.

*Id.* ¶¶ 16-28.

On October 16, 2023, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission and the California Civil Rights Department alleging discrimination, retaliation, and hostile work environment. *Id.*, ¶ 30. She received right-to-sue letters on October 16, 2023 and filed the instant action in the Alameda Superior Court the same day. In the Complaint, Plaintiff asserts the following claims: 1) violation of the Fair Employment and Housing Act ("FEHA"), California Government Code section 12940(a) – race discrimination – against State Farm, *id.* ¶¶ 31-42; 2) violation of FEHA, California Government Code section 12940(h) – retaliation for reporting race discrimination – against all defendants, *id.* ¶¶ 43-57; 3) violation of FEHA, California Government Code section 12940(j) – hostile work environment – against all defendants, *id.* ¶¶ 58-75; and 4) violation of FEHA, California Government Code section 12940(k) – failure to prevent race discrimination and retaliation – against State Farm, *id.* ¶¶ 76-87.

### B. The Notice of Removal

On November 26, 2024, Defendants removed to federal court on the basis of diversity jurisdiction. Dkt. no. 1. To establish that there is complete diversity of citizenship among the parties, they asserted that Little was fraudulently joined. *Id.* at 10-15. In particular, they contend Plaintiff cannot prevail on either of her two claims against Little, for retaliation and harassment. *Id.*

### C. The Motion

In the Motion, Plaintiff contends the case must be remanded because the requirements of diversity are not met. Motion at 6-7. She rejects Defendants' assertion that Little was fraudulently joined, asserting that her hostile work environment claim against Little is adequately pled and

7

supported by evidence sufficient to survive Defendants' challenge. *Id.* at 8-11.[2] She offers a declaration expanding upon the allegations in the Complaint describing Little's harassment, Duncan Decl., dkt. no. 13-1, as well as two articles addressing the "angry black woman" stereotype in the workplace. Cannata Decl., Exs. B & C.

In her declaration, Plaintiff states, in part:

> 2. When I was working for Defendant State Farm Mutual Automobile Insurance Company ("State Farm") as a Litigation Attorney, my managing attorney, Defendant Jeanette Nicole Little ("Little"), assigned an individual ("LF") to be my paralegal. I knew that LF had prior performance issues. I am informed and believe that Little reassigned LF to me to burden me and negatively impact my performance at State Farm.
>
> 3. In or about 2022, LF resigned from his position. It was a policy at State Farm for new, inexperienced paralegals to be placed with less senior employees, while more senior employees were assigned more experienced paralegals. I had more seniority over non-black attorneys that were assigned experienced paralegals and secretaries. Instead of simply assigning another paralegal with existing paralegal experience, Little assigned me the newest, incoming paralegal, who had no prior experience as a paralegal. Little also reassigned my existing legal secretary to a white, male attorney and assigned a new, incoming legal secretary to me. The nonblack attorney should have been assigned the new legal secretary. I believe that Little purposefully assigned these two individuals because she wanted me to fail and to improve the performance of the white attorneys in the department.
>
> 4. After my first meeting with Little on or about July 25, 2022 regarding my performance review for the second quarter of 2022, Little and her supervising attorney, Kristin Givens, searched for evidence to support Little's claim that I was "abrupt and confrontational" and emotional in my communications. Little surveyed, without success, all of the paralegals and secretaries in order to find any shred of evidence to support such claim.
>
> 5. After I reported Little's derogatory and racist comments, in or about August 2022, I, and all of my colleagues, were required to attend an in-person, team building luncheon. Little was in attendance. During the entire event, Little spent time conversing with other colleagues. She did not make any attempt to speak with me at this event, even though the purpose of the event was team-building. I perceived her unwillingness to speak with me as an effort to isolate me from my peers. On a separate occasion, at or around the same time,

---

[2] Plaintiff concedes that her claim for retaliation fails as to Little because a supervisor cannot be held liable for retaliation under California's Fair Employment and Housing Act ("FEHA"), California Government Code section 12940(h). Motion at 2 n. 1 (citing *Jones v. Lodge at Torrey Pines*, 42 Cal. 4th 1158 (2008)).

8

> at a colleague's funeral, Little, once again, did not speak with me or approach me in any way. It was clear to me that she was making a deliberate effort to isolate me from the rest of my colleagues who were in attendance.
>
> 6. On or about November 1, 2022, Little provided three examples of instances in which I allegedly yelled or raised my voice at her, her secretary, and her supervisor, Kristin Givens. I denied these allegations because they were false. My style and manner of work is professional and courteous to my coworkers. It became clear to me that there was no proof of Little's accusations and that she was attributing to me the image of a stereotypical "angry Black woman."
>
> 7. After receiving the same criticism regarding my communication skills in my performance reviews in the third and fourt quarter of 2022, and never having received any management training from Little, I realized that I would never advance to a higher paid position at State Farm and that Little would continue to harass me if I remained in my position as a Litigation Attorney. My self-esteem deteriorated and I suffered multiple health issues, including anxiety, insomnia and hives, which made working at State Farm even worse than it had already become. My work life at State Farm turned from tolerable to miserable because I was experiencing harassment from Little on such a frequent basis.

Duncan Decl. ¶¶ 2-7.

In their Opposition, Defendants counter that "Plaintiff's allegations against Ms. Little are nothing more than mere personnel management decisions which cannot subject Ms. Little to personal liability for alleged harassment." Opposition at 7. They further assert that "Plaintiff's boilerplate harassment allegations do not tie Ms. Little's alleged conduct to Plaintiff's race." *Id.* at 9. They also argue that Little's actions are not "sufficiently severe or pervasive 'so as to alter the conditions of employment and create an abusive working environment.'" *Id.* (quoting *Fisher v. San Pedro Peninsula Hospital*, 214 Cal.App.3d 590, 608 (1989)).

### III. ANALYSIS

#### A. Legal Standards Governing Fraudulent Joinder

Federal district courts have jurisdiction over suits that place more than $75,000 in controversy where the citizenship of each plaintiff is different from that of each defendant. 28 U.S.C. § 1332(a). "Although an action may be removed to federal court only where there is complete diversity of citizenship, 28 U.S.C. §§ 1332(a), 1441(b), 'one exception to the requirement for complete diversity is where a non-diverse defendant has been "fraudulently joined." ' " *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1043 (9th Cir. 2009) (quoting *Morris v.*

9

*Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001)). "Joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state.' " *Morris*, 236 F.3d at 1067 (quoting *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987)).

"[F]raudulent joinder claims may be resolved by 'piercing the pleadings' and considering summary judgment-type evidence such as affidavits and deposition testimony." *Id.* (quoting *Cavallini v. State Farm Mutual Auto Ins*. Co., 44 F.3d 256, 263 (5th Cir.1995)); *see also Sukin v. State Farm Mut. Auto. Ins. Co.*, No. C 07-2829 VRW, 2007 WL 9728897, at *2 (N.D. Cal. Oct. 12, 2007) (observing that a removing defendant "may demonstrate fraudulent joinder factually, because if it would be appropriate to grant summary judgment on the sham defendant's claim, then the removing defendant has demonstrated that 'the individuals joined in the action cannot be liable on any theory.' " (quoting *Ritchey v Upjohn Drug Co*, 139 F3d 1313, 1318 (9th Cir 1998)). In considering such evidence, all reasonable inferences are drawn in favor of the plaintiff. *In re Roundup Prods. Liab. Litig.*, 396 F. Supp. 3d 893, 896 (N.D. Cal. 2019) ("fraudulent joinder exists 'if, after all disputed questions of fact and all ambiguities in the controlling state law are resolved in the plaintiff's favor, the plaintiff could not possibly recover against the party whose joinder is questioned.' ") (quoting *Jurin v. Transamerica Life Ins. Co.*, No. C 14-02882 LB, 2014 WL 4364901, at *3 (N.D. Cal. Sept. 3, 2014)).

"A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a 'heavy burden' since there is a 'general presumption against [finding] fraudulent joinder.' " *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018). Thus, " 'if there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court' ." *Id.* (quoting *Hunter*, 582 F.3d at 1046 (quoting *Tillman v. R.J. Reynolds Tobacco*, 340 F.3d 1277, 1279 (11th Cir. 2003) (per curiam)) (emphasis added in *Grancore*)).

**B.     Discussion**

To establish that joinder is not fraudulent, Plaintiff argues that she has asserted a viable claim for harassment against Little under California law. The Court finds based on the facts alleged in the Complaint and the supporting declaration of the plaintiff that it is not obvious that a California court would conclude that Plaintiff cannot prevail on her harassment claim. Therefore, the doctrine of fraudulent joinder does not apply.

Under FEHA, an employer may not harass an employee based on, *inter alia*, race or sex. Cal. Gov't. Code § 12940(j)(1). To establish a harassment claim under the FEHA, the plaintiff must demonstrate that (1) they are a member of a protected group; (2) they were subjected to harassment because they belonged to this group; and (3) the alleged harassment was so severe or pervasive that it created a hostile work environment. *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 983 (E.D. Cal. 2016).

A claim for harassment under the FEHA is distinct from a claim for discrimination under Section 12940(a) of the FEHA. *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 705 (2009), as modified (Feb. 10, 2010) ("In the FEHA, the terms 'discriminate' and 'harass' appear in separate provisions and define distinct wrongs."). In particular, "the FEHA's discrimination provision addresses only explicit changes in the 'terms, conditions, or privileges of employment' . . . [whereas] harassment often does not involve any official exercise of delegated power on behalf of the employer." *Id.* at 706. In other words, "discrimination refers to bias in the exercise of official actions on behalf of the employer, [while] harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." *Id.* at 707.

In *Roby*, however, the California Supreme Court explained that "the two theories are sometimes closely interrelated, and even overlapping, particularly with regard to proof." *Id.* The court pointed to its decision in *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 451 (2005), in which the court found that "evidence of widespread sexual favoritism in the workplace could constitute sexual harassment against the nonfavored employees." *Id.* 707-708. The Court in *Roby* stated:

> [I]n *Miller* the immediate source of the plaintiffs' alleged injuries was the offensive sex-biased message that the supervisor conveyed, not a demotion or an unfavorable job assignment, and therefore the

11

> plaintiffs' cause of action was for *harassment*, not for discrimination. Nevertheless, official employment actions constituted the *evidentiary* basis of the harassment cause of action, because the supervisor used those official actions as his means of conveying his offensive message.

*Id.* at 708 (emphasis in original).

Thus, in *Roby*, the court found that the Court of Appeal had erred in concluding that evidence of official employment actions that supported the plaintiff's discrimination claim could not be considered by the jury in determining whether the plaintiff had also been subjected to harassment by her supervisor. *Id.* at 710. Rather, the court found that in evaluating the plaintiff's harassment claim, the jury could consider not only the "rude comments," "shunning" and "belittling" of the plaintiff by her manager but could also draw inferences based on "acts of discrimination . . . establishing discriminatory animus on the part of the manager responsible for the discrimination, thereby permitting the inference that rude comments or behavior by that same manager was similarly motivated by discriminatory animus." *Id.* at 709.

Here, the complaint includes allegations that Plaintiff was the only African-American attorney in her department of twenty-one attorneys and that Little attempted to derail her opportunities for advancement by, among other things, assigning her the least qualified paralegals, shifting an excessive workload on her when another employee went on bereavement leave to create a poor performance record, failing to provide her with management training despite being instructed to do so, and berating her for taking paid time off even though it was within company policy. She also alleges that Little claimed Plaintiff's communication skills were "abrupt and confrontational" – a characterization Plaintiff concluded was based on a stereotype related to "angry Black women" -- and repeated these claims in two further performance reviews despite any evidence to support this characterization. And Plaintiff stated in her declaration that when a mandatory "team-building" lunch was held in response to her complaints about Little's "derogatory and racist" comments, Little refused to speak to her, attempting to "isolate [Plaintiff] from her peers." Duncan Decl. ¶ 7. Similarly, Little did not speak to Plaintiff at a colleague's funeral, which Plaintiff took as a further indication that Little was attempting to isolate her from her peers. *Id.*

In light of the standards articulated in *Roby*, the Court finds that is not obvious that Plaintiff cannot state a claim for harassment under California law. As *Roby* makes clear, the mere fact that some of Little's conduct may have been official employment actions does not preclude Plaintiff from relying on that conduct to establish that she was subjected to a hostile work environment. Nor can this Court confidently conclude that a California court would find that Plaintiff will not be able to establish that Little's conduct was motivated by race in light of the allegations in the Complaint and Plaintiff's declaration that Plaintiff was the only African-American person in her department, that white attorneys with less experience than Plaintiff were assigned more experienced paralegals, contrary to State Farm's policy, and Little's allegedly unsupported claims about Plaintiff's conduct, which may reflect a racial stereotype about "angry black women."

In sum, the Court concludes that Defendants have not overcome the strong presumption against finding fraudulent joinder.

## IV. CONCLUSION

Because Little was not fraudulently joined in this action and her presence as a defendant destroys complete diversity, the Motion is GRANTED. This case shall be remanded to the Alameda County Superior Court.

**IT IS SO ORDERED.**

Dated: February 24, 2025

JOSEPH C. SPERO
United States Magistrate Judge

13